Good morning. Welcome to Day 3 of our sitting here in Atlanta. Happy Holidays to all. Judges Grant and Abudu and I are happy to have you here before us. We've got four cases this morning. Before we get going, just a few preliminaries. Most of you have been here before, but please know that we've read your briefs, the underlying materials, the cases, the statutes, the record. We're familiar with the cases, and so don't waste your own time with a bunch of factual and procedural ramp-ups. Unnecessary. You've got limited time before us, so just get after it. Two, you'll understand the traffic lighting system. Green, go. Yellow, slow. Red, please stop. As I've said the last two days, for better or worse, I'm not the kind of guy who can, like, muster the emotional energy to cut you off. You are in the meeting now. Just setting the mood. Not going to cut you off in the middle of a sentence, but I would ask you to respect our time so when you see the red light, begin to wrap up. And if we carry you beyond your allotted time with questions, don't sweat it. All right. So with that, let's move to the first case. 24-12444, State of Alabama versus the United States Secretary of Education. Got Mr. Norris here for the appellants. Mr. Norris, you have reserved three minutes. Very well. Proceed when ready. Good morning, Your Honors. I represent the private plaintiffs in this case but have permission today to argue for all the plaintiffs. May it please the Court. The question on appeal should not be whether to enjoin the Title IX rule, but how. All nine Justices agree that similar plaintiffs were entitled to preliminary injunctive relief as to three provisions of the rule, including the rule's definition of sex discrimination. Though the Justices did split on the scope of relief, five of them said that the government had not justified letting the rule take effect without its central definition of sex discrimination. Can I ask you just a question about the Louisiana order? It's an extraordinary thing, I think, right? It's a State denial which of its own force wouldn't necessarily be binding for much of anything, I guess, right, because it's sort of fundamentally discretionary, it doesn't necessarily entail an adjudication of the merits. However, the Court sort of attaches this thing to it, this document. So what do we do with that? Your Honor, our position is that that majority opinion of the Supreme Court that's reasoned is binding on lower courts. The Supreme Court certainly treats its reasoned stay at injunction opinions as binding. State denials as well as State grants? I believe so, Your Honor. I think Justice Kavanaugh has written on this himself, and he explained, you know, it's a decision that we make when, on our emergency docket, when we write an opinion explaining what we mean. We make that decision in order to provide guidance for the lower courts. We don't have to do it. We could have just had one line. But what about the language on the bottom of 2, in this emergency posture in this Court, and then on this limited record and in its emergency applications, the government has not provided the Court a sufficient basis to disturb the lower court's interim conclusions? Doesn't that qualify it a little bit? It qualifies it a lot on the argument that's being discussed in that paragraph, which is just severability. So the scope of relief question, we do think you're not bound by the Supreme Court's opinion. What you're bound, in our view, is to say is that similar plaintiffs, States and private organizations, just like in those cases, are entitled to a preliminary injunction on three provisions. That's what the Court went out of its way to say, and then the dissent went out of its way to say again that all nine justices agree on this point. So, you know, even if it weren't technically binding, I think that is extremely persuasive and there would need to be some new argument or new evidence from the Justice Department that would make you want to change, to change that conclusion. And I just don't think they've made any new arguments at all. If you look at the briefs that they submitted in the Tennessee case to the Supreme Court, there is 20 pages on why Bostock applies to Title IX. It is their second argument, was their second lead argument in the case. So that argument was thoroughly presented to the Supreme Court. The Supreme Court took weeks to put this opinion out. It took its time, considering the emergency nature of the request, and it put out this statement from nine justices that the State and private plaintiffs in those cases were entitled to a preliminary injunction. So it's merits, irreparable harm, the equities on those three provisions. So I think the question before this Court, the only possibly open question is the scope of the relief. Well, I mean, I think there are plenty of pages in the district court's order in which it's not really saying that perhaps you lose on the merits. It's saying that you didn't present sufficient allegations and evidence to support the claim in the way that the other plaintiffs in the other cases you cited did. So it could be that the grant of the injunction in those cases was warranted because the plaintiffs did a better job of presenting their case. That is theoretically possible, Your Honor. It's just not true at all. Our briefs, I would put them up against any of the briefs in any of the cases. Some of the briefs in the other cases actually quote our briefs verbatim. We presented all the same arguments, the same types of injuries, the same types of claims. And I do think, while that is theoretically possible, that argument is really dropped out of this appeal. Well, it's not theoretically possible. That's what the district court found. But it's not being defended by my friends anymore. It's also what we think is an abusive discretion. That is a misapplication of forfeiture. But I don't think it's going to constrain this Court because forfeiture applies to claims, not arguments. And the motions panel, which we think correctly found that all of the key claims that are being All of those claims, if you look at our papers, they're all clearly there. My friend also isn't pressing forfeiture except for maybe one point about 106.31a2. But more importantly, the district court, we don't read it for the claims that we're presenting on appeal. We don't read that opinion as saying we would have lost independently because of a forfeiture problem. We think the district court actually said, you know, the district court had complaints about our briefs, which we take very seriously. I mean, our job as lawyers is to persuade courts. And so we are going to do a better job at But we don't think, besides those complaints about our briefs, we don't think that there was an alternative holding of forfeiture because the district court went on to pass on each of our major claims, which preserves them for review by this Court. Can I ask you, I guess, a question? Like, setting Louisiana, the Louisiana order aside just for the moment, if we sort of pierce that writing and get to the merits, I guess, the merits of the preliminary injunction, so the merits merits, if we don't read Adams to provide a basis for limiting Bostock to Title VII, if Title IX weren't spending clause legislation, what would be the textual basis for not applying Bostock to Title IX, given the similarity of the language in the two statutes? Or is it really just that it is spending clause legislation, and so never mind all of that? The spending clause distinction is my best argument. So I do think even Bostock appreciated that its reading of Title VII would have been very unexpected 50 years ago when that statute was passed. Now, Justice Forsyth, in his majority opinion, said that doesn't matter if you're doing pure textualism. But this is a spending clause case where it matters a whole lot what the expectations of the states were when they decided to take the Federal money. But your question sets that argument aside. So just, if you don't have a spending clause gloss, we think we have about three good arguments why Title IX is not Title VII. One is an argument that was endorsed in Adams, which is that if Title IX covered gender identity, it would render many of the statutory and regulatory exemptions meaningless, because those exemptions actually only allow, for the most part, many of those exemptions only allow schools to separate on the basis of biological sex. And so if Title IX covers gender identity, that means that schools can separate based on sex, only to the extent students don't identify as the other sex, which Adams says renders them essentially meaningless. Do those regulations account for what the dissent in Adams highlighted, which is those who fall into the category of intersex? What are they supposed to do? I'm not sure how these regulations affect intersex. I do think in the rule itself does have a discussion of, this rule has a discussion of intersex students, and I think they put that under the category of sex characteristics, which is another part of 106.10. I don't think that they would describe that as gender identity, which is what I thought Judge Newsom's question was about. I think the second textual reason that's rooted in Adams, though, is this dual protection issue, where the court said that if gender identity is covered by Title IX, it actually gives transgender students not equal rights based on sex, but more rights. So in situations where you're allowed to separate on the basis of sex, a transgender student could take either the option that aligns with their sex or the option that aligns with their gender identity, whereas someone who is cisgender can only choose the option that aligns with their sex. But in that situation, is it that then they can go back and forth at whim, or they make a decision at the outset, and then that's what the student sticks with throughout the school year? I think under the rule, they can go back and forth at whim, and the reason that we know that is that there's a discussion in the rule about the definition of gender identity, where the rule says we decline to adopt a definition of gender identity. Instead, all we're going to say about it is that it is someone's subjective sense of their gender. And so this is another problem that Adams identifies, which is, what about gender fluid people? Gender fluidity is not the facts of Bostock whatsoever. Bostock had a male who identified permanently as a traditional female. So when you change the sex of that person, you can see why that may be a but-for cause. That is not the case when you have gender fluid or non-binary individuals, which are also covered by the rule. This is maybe a better question for your friend on the other side, but I don't understand why there seems to be so little discussion of the fact that Bostock itself proceeded on the assumption that sex meant biological sex. I don't know why this opinion, or the Supreme Court's approach, couldn't be read consistent with Bostock in the sense that it relies on sex as biological sex. And then Bostock, of course, proceeds to say still that's the starting point. The question isn't just what sex meant, but what Title VII says about it. So can't you read these cases as consistent, if you wanted to, based on that starting assumption from Bostock? I believe that, what I'll say is this, that I think Bostock has not just that assumption, but a couple of other core assumptions that just disappear with respect to this rule. So Title VII assumes, and they said this explicitly in the opinion, that males and females are similarly situated for purposes of the job that they're being hired or fired from. That was the facts of Bostock, but it's also built into Title VII. Title VII says sex is like race. It is not relevant. And the reason that you know it's not relevant is because there is an exception in Title VII for what's called bona fide occupational qualifications, where if sex is relevant, it's out of the statute. So the statute only covers situations where sex is irrelevant because males and females are similarly situated. That limitation is nowhere in this rule. There is no requirement that males and females be similarly situated. So it applies across all of Title IX. 106.10 applies on its face to bathrooms, which is something they admit. It would apply on its face to sports. It actually needed a separate regulatory carve-out to explain why it didn't apply to sports. It applies to sex ed class. It says that if you have male genitalia and you identify as female, you can go to the female sex ed class and learn about genitalia you don't have. It covers all of these different scenarios where males and females are not similarly situated. So it's not, it really doesn't match Bostock at all. I think even if there is a... No, I guess what I'm saying though is that at the fundamental starting point of sex is biological sex, Bostock proceeds on that assumption. And that's what you're asking us to do here. And then Bostock, right or wrong, of course we have to assume right in our posture, but right or wrong, goes in a different direction based on what else is in Title VII. And I think you pointed out that there are important differences between Title VII and Title IX that even if you take Bostock for what it's worth would point in a different direction here. I guess I don't see the necessarily fundamental tension that the other side is trying to describe with Bostock when Bostock II has a starting point of biological sex. I understand that point, Judge Green. I think I agree with it. Also, you know, I think my friend is going to say that even under the spending clause, Bostock itself said that its interpretation of Title VII was unambiguous. That's actually not what Bostock says. It says it's unambiguous as applied to these facts, which was a situation where males and females were similarly situated. And of course, it can't be unambiguous. Bostock ends by saying we do not opine on any other federal anti-discrimination statute, which would include, of course, the most famous one on sex, which is Title IX. All right. So I've got a couple more. So we're going to hold you here if you don't mind. Can I ask you about irreparable injury? And I guess I'm again asking you to set Louisiana aside for the moment, right? Compliance costs. Is it your contention that unrecoverable by virtue of sovereign immunity compliance costs, no matter how minimal, are necessarily irreparable injury? Or is there some quantitative aspect to that determination? I think our answer to that theoretically is yes. Any amount of unrecoverable compliance costs would be irreparable harm. That doesn't mean you win the balance of the equities if they're very, very small. So we set a Sixth Circuit opinion on this, I think, that makes this distinction pretty well that says that's still relevant to the equities. It's just you move past the irreparable harm part and go on to the balancing. And then, you know, in a case like this one, I think the balance is still going to be one where the regulation is likely unlawful and unenforceable anyway. So there's nothing on the government's side of the ledger. But that is very hypothetical. This is maybe the major rulemaking on education from the Biden administration. If you look at the rule itself, it spots us $100 million in total compliance costs in year one of the regulation, which it spreads out, which we think is an absurdly low number, but it spreads out to at least $10,000 per school. It spots us six to 12 hours of time having to review the rule and update policies, which, again, it took me more than six hours to read this thing. I'm not sure where they got that number from. But these are things that are conceded in the rule. It also spots training requirements that are going to take time. And you have to train your employees now. If you hire anyone new, you have to keep retraining them on this rule. And it has its time and its money, and it's substantial. I think this is not the poster child for this concern. So I might have misunderstood something from the record, but you just mentioned a $100 million figure. Is that right? Right. What was the, I thought in the briefing, there was a spread of like, say, six to $18 million or something over the course of 10 years. What's that? Yeah, I should have clarified. So I didn't understand this until prepping for the argument. That is what they say is the net cost over 10 years. So if you look at the chart in the rule, it says year one, it's going to cost $100 million. Years two through 10, we think there's going to be cost savings. So it nets out to about $18 million over 10 years, which would still say $18 million is, that's unrecoverable because if their sovereign immunity counts as irreparable harm. But it's important, I think, in the first year, which is, you know, I think relevant to a preliminary injunction that's trying to freeze the rule before it takes effect. The first year is $100 million. That's where all the compliance costs are front loaded. And what would the, maybe you haven't done the math, but what would say, for instance, and I know you represent the private plaintiffs, but for instance, what would a single state's share of that first year cost be? I'm just trying to figure out because for some reason to me, like the quantum does matter, because I worry that if we say, you know, a dollar of compliance costs unrecoverable by virtue of sovereign immunity is irreparable injury. Two things. One, I worry a little bit that we've lost the focus of the preliminary injunction, which is basically just to prevent something happening now that we can't fix later in the litigation to go away, basically in the court to lose remedial power. And then also I worry about the irreparable injury factor, so to speak, just sort of merging into the merits. If it's a dollar, if it's a peppercorn, then who cares? It's really just a one-factor test. So do you have a sense for what sort of one-party share of that first-year cost would be? I don't, Your Honor. I don't think it's in the rule. Again, we don't accept any of these We put out 10 declarations from state and school officials across all four states that say, those numbers are too low. Here's exactly what we're going to have to do to comply, and it's very burdensome. I do think the $18 million figure, they do spread out to say it's about $6,000 to $10,000 per school. But, Your Honor, I don't think this concern, I mean, maybe it's unique to major federal regulatory cases, but of course in most cases where you seek a preliminary injunction, you're allowed to get damages. And so the irreparable harm factor is not satisfied by mere monetary harms. It's in the unique scenario where you sue a federal agency and you can't ever get that money back. And again, I just don't think, you know, I think this Court may have already crossed that line in the Georgia versus President of the United States case where it said the ordinary cost of compliance with a federal regulation that operates directly on the states satisfies the irreparable harm requirement. So we at least have the ordinary costs here. It is a different question, right? When the states are, again, the direct subject of a regulation as opposed to when they're claiming follow-on effects and costs from the follow-on effects, which we've of course seen in some cases, and there's disagreement about whether that's enough. But don't you think there's a difference when the United States is directly regulating the states? I do think that's an important difference. It makes this case quite easy for the states improving irreparable harm. It's also not that sympathetic of a subset of cases to worry about. These are the cases where you've got a major federal regulation that the Court has concluded likely violates the APA. That's the scenario we're talking about. Otherwise, we're definitely not going to win the balance of the PI factors. Can I ask you just one about severability, which we haven't talked about yet? Because I think this like lives on even with Louisiana, right? Like even if you win your Louisiana argument, we've got to think about severability. Is it true really that with respect to what I'll call, not the definition of harassment, but the definition of sex discrimination as gender identity discrimination, is it true that that touches sort of like every last aspect of the rule? I get it that it's pretty pervasive, but I mean like some of the things that this rule does are just so nothing. You know, designating the department as the Department of Education, you know, sort of kind of dotting i's and crossing t's. Do we really need at that point to strike the entire rule or are there bits and pieces of this that might survive? So I think this question is tackled most fulsomely by Chief Judge Sutton in the Sixth Circuit State opinion. He actually goes provision by provision. He calls them the substantive provisions and shows how each one relies on and incorporates the now illegal definition of sex discrimination. And he's actually, that Sixth Circuit called for supplemental briefing on this point. There's a very fulsome set of briefs from the government in Tennessee and those states that go provision by provision and explain these points and then that shows up in the opinion. I think that's a very good encapsulation of what's going on. He does say there do seem to be some very technical provisions of this rule that are not necessarily touched by the sex discrimination definition. And he says that's open to the government on the merits appeal, the version of what we're doing now, to argue that those should be preserved. But that is not an argument that my friends are making. They don't ask you to keep just the technical provisions. And I think I would not do that without the government's blessing because who knows what effect that would actually have on what from the 2020 rule comes back, what is still repealed, and what, you know, how it all interacts with itself. What we do know is that there is a 2020 rule. It's been in place for four years. If you're to grant state-specific but rule-wide relief here, that would maintain the status quo until we can go back and brief cross motions for summary judgment. So you're saying right now there aren't provisions in schools, for example, to ensure that biological females who just had a baby and want to provide breast milk or breast feed, that that provision, if it is maintained, is some form of irreparable harm to your clients? How is even filing a Title IX complaint and the anti-harassment or retaliation protections of the rule, how is that irreparable harm to your client if they survive the stay? So many of those provisions impose new obligations on states and their schools. So retaliation now includes peer retaliation, not just retaliation by the school. Title IX now covers misconduct that occurs overseas, off campus. How, okay, but you're asking for a broad injunction. How does those provisions, the two that I just cited, for example, accommodations for girls who are pregnant and ensuring that people who even file a complaint, even if it ends up not being meritorious, aren't harassed or retaliated, don't we have to view that through the lens of also irreparable harm to your client? I don't think we need to prove, Your Honor, irreparable harm as to each provision, though I think we can. So those are new obligations that cost time and money and impose new liabilities on schools. So there is an irreparable harm there. But I should have said we don't have to prove that those are illegal in and of themselves. If they are legal, they can pass them in separate rules, and that's okay. But they are bound up with the illegal parts of this rule. So those examples— How are they bound? Just because they come to—they appear in the same document, they're bound up? Or what is—I guess I'm trying to understand what is the connection that's so strong that those provisions can't survive, even if you're successful on the three that you really care about? So the rule, when it talks about the pregnancy provisions in particular, it does say that even the 2020 rule has lots of protections for pregnant students. But the lactation spaces is a new thing. The district court in the Tennessee case said it actually incorporates—that part of the rule incorporates the definition of sex discrimination in a way that makes it seem like you would have to provide access to males who identify as females and have children to those lactation spaces. So it is affected. But the definition of complainant, which is the other example Your Honor gave, is— So I'm sorry, you're saying the concern that a transgender female, even if biologically can have a baby, is still somehow going to benefit from the lactation services? And that is the harm that you need to prevent right now? Well, I mean, I think biological males can adopt children and use in vitro fertilization and things like that. So when they have a baby, the Tennessee district court said the Justice Department hasn't explained why you wouldn't have to let males have access to those spaces as well. But just to get to the other example, which I think is even stronger, the definition of complainant, which is what allows the schools to—imposes more responsibilities on the school to respond to allegations, that definition literally says complainant is someone who alleges sex discrimination. That's the definition in 106.10. It is inherently tied to that definition, which we think in the Supreme Court thought was likely illegal. Okay. So just to make sure that I'm comfortable, what then for the two categories I just identified, although there are probably more, what would be the recourse for those individuals if not this rule? I'm sorry, Your Honor. I'm not sure what individuals we're referring to. Someone who files a Title IX complaint and then is retaliated against and wants to bring that claim. What is their vehicle if this rule—if we strike down those provisions as well? So retaliation, as Judge Newsom knows, is covered by Title IX. That was cheap, despite very strong advocacy from the State of Alabama in that case. So that remains covered. The nuance of the new rule is that someone who files a Title IX complaint now, the school can be held responsible if their peers retaliate against them, which is a—you know, I'm not sure what the effect, if that happens to someone, that sounds very unfortunate. I hope there are other policies at these schools that could deal with something like that. I'm sure that there are, but— But you can't recite them for us now for purposes of determining whether or not we should also include that provision in the injunction. That's right. And when you shift to peer retaliation, that is a big shift in the responsibilities of the schools. And that is not something they want to be held responsible for because they have less control over that kind of thing. It is not discrimination by the school, necessarily, to—because they didn't respond adequately to what some of their students did to one of their other students. But that would be kind of creating a separate set of jurisprudence in terms of causation and liability and all of those things. And that's what our case law does. Departments execute regulations and then we spend decades trying to suss out what they mean. So, I don't know if that's a strong enough reason to make or to issue the broad injunction that you're requesting. Well, I mean, Congress can amend Title IX to cover peer retaliation if it wants, but we're talking about the spending clause, clear statement rule. That is not clearly, currently in the statute. But more importantly, I think the key point is that the three provisions we've identified as illegal are totally bound up. And with that provision, that provision can't stand alone because, of course, what is retaliation? It's responding negatively towards someone who filed a complaint of sex discrimination or sex-based harassment. Both definitions, all nine Justices agreed, are likely illegal under Title IX and one of them under the First Amendment as well. Thank you very much. We kept you up there a long time. We appreciate your endurance. And to let everyone else in on the inside joke, I think Mr. Norris was referring to a case that I lost as Alabama Solicitor General, catastrophically, in the United States Supreme Court, in which the Court recognized an implied private right of action under Title IX for retaliation. You have me to thank. All right, Mr. Myers. Good morning, Your Honors. May it please the Court, Stephen Myers for the government. The district court did not abuse its discretion in denying a sweeping preliminary injunction against the entirety of the Title IX rule. And the plaintiff's position most fundamentally rests upon a misunderstanding of how the rule operates, and in particular, the specific and limited functioning of 34 CFR 106.10. Can I ask you, maybe just before we get into the nitty-gritty, to deal with Louisiana? Absolutely. Which is a pretty extraordinary thing. Whatever it is, if it's a state, you know, it's a state denial instead of a state grant. So, you know, maybe there are differences. But it's a pretty extraordinary piece of paper. You know, there are these opinions that are attached to it. And both the majority and the dissent say, in so many words, all nine of us agree that the plaintiffs here, which are pretty similarly situated to the plaintiffs in this courtroom, are entitled to preliminary injunctive relief, at least with respect to the very three provisions that we're dealing with here. That's a lot for an intermediate court of appeals to walk away from. So I think it's important at the outset just to keep in mind what the question was in the Louisiana application, right? The question was whether the government had satisfied its burden of demonstrating entitlement to a stay in the Supreme Court. And that's fundamentally a different question from whether plaintiffs satisfied their burden of demonstrating entitlements to a preliminary injunction in district court. True, true, true. But as Mr. Norris said in response to Judge Grant, the language of the order in which the Supreme Court discusses the government's failure to discharge its burden is really with respect to what I'll call the balance of the rule, right? What divided the justices in Louisiana was not the three provisions. It was the balance of the rule. Well, so what the majority said with respect to the three provisions was really extremely limited. What it said is that the Court today accepts entitlement to preliminary relief with respect to those provisions. There's not a clear holding on that point. And I guess I would just underscore that the Supreme Court knows how, in an emergency posture, to really write a considered opinion that addresses the merits. I point the Court, for example, to the Alabama Association of Realtors case. There's a line in that case which went to the Court on a stay application that says like, you know, not only are plaintiffs likely to win, it's difficult to imagine them losing. And then there's pages of analysis about the Public Health Service Act. Don't you suspect that part of the reason the order was, although it's comparatively long in some senses, it's short compared to some of the others you're citing, was the short amount of time before the school year started when they, I'm not crafting my sentence appropriately, the regulation was issued with a very short amount of time before the school year started. So the litigation proceeded, I think we'd say, at a very fast pace. I don't think we can hold the Supreme Court responsible for not writing a 20-page discussion right before the school year. So I'm certainly not, you know, meaning to cast aspersions on the Supreme Court. I would observe that the ramp-up or the compliance period in this rule was broadly comparable to the period with, you know, in the 2020 rule. So there's nothing extraordinary about what happened here. But as I said, the Supreme Court has shown, you know, it's capable, if it wants to, of putting out a reasoned merit statement. So what different evidence have you brought here in this case that we could look at and say, oh, that's the answer, that's why we should take a different path than the Supreme Court took in its slightly more preliminary posture? Your Honor, I wouldn't say that we're advancing different evidence. You know, this is an APA case. We've tried to present our arguments, you know, as fulsomely as possible in the space that we have. But I think fundamentally our point is just that the Supreme Court did not answer the question that's before this Court. And this Court should be looking at it, you know, with fresh eyes. And obviously it can consider what the Supreme Court said. But we don't think that that's binding on this Court. Don't we have, don't the challengers have an even stronger case here because of Adams in particular and perhaps Agnes Tucker as well? Don't we have specific case law in this circuit that other circuits do not have with respect to Title IX? So obviously, yes. I mean, the circuit does have Adams and it does have Agnes Tucker. We don't think those cases answer the question here, though. And in addressing that, I want to make sure that we disentangle 34 CFR 106.10 and 106.3182. So to start with .10, that's the provision that acknowledges that sex discrimination includes gender identity discrimination. And so that's the provision that is leading to the result that, for example, if a school gives a student detention for being transgender, that's a potential Title IX violation. And that's obviously just not the question that was before the Court in Adams, right? Adams was addressing the sorting of students and of transgender students in particular by sex. And Adams addresses that question. But even if Adams were fully binding, you know, in every respect on the bathroom question and I can turn to that in a second, but we don't think it's answering the 106.10. Tell me how it's not binding on the bathroom question in particular. Sure. So on the bathroom question, and this is really an issue about 106.3182, not 106.10. Adams, you know, the main question in Adams was what does the term sex mean, right? And Adams holds that sex means biological sex. And then Adams seems to assume that Section 106.33, the bathrooms regulation, is implementing the statutory carve-out for living facilities. We don't take that to be a holding of the Court. And, you know, we think the better reading is that this was just not really contested in Adams. We would submit that 106.33 is not implementing 1686 because bathrooms are not living facilities. And that regulation was, in fact, promulgated pursuant to the statute's general nondiscrimination mandate, not 1686. And so Adams— And is it in Adams it was just assumed by both sides and no one really contested it, and now we're all going to realize that we were incorrect, that bathrooms are not living facilities? Well, I think, as I say, I don't think it should be construed as a holding of the Court because it wasn't contested. And I don't think it would be fair, really, to the Court or other courts, you know, in this jurisdiction to treat something that wasn't squarely briefed and squarely argued as— Unfortunately, that's not—we have, I think, a very strong prior panel precedent rule in this particular circuit. And the fact that we didn't consider or discuss an argument is never held to be a reason that it wasn't really a holding on that issue. I don't know why it would be different in this case than in all the other cases where we make that point. So I don't have the case in front of me, although I think this Court has said that when issues are not really, like, squarely litigated by the parties, they might not be treated as a holding. But, you know, take it as a given that you disagree with me on that. That would suggest, I think, at most that 106.31a2 can't be validly applied as to bathrooms because bathrooms, you know, if the Court is correct that they're living facilities under Adams, you know, that aspect of Adams would control. But it wouldn't undermine 106.31a2 in any other context that's not governed by the living facilities provision. Can I just briefly go back to Louisiana? And I'm sorry if I'm hung up on it. I'll just confess that I'm a little nervous about walking away from whatever this thing is, sort of formally binding or otherwise. I'm a little nervous about walking away from statements that all nine Justices, either accept or, as Justice Sotomayor said, are entitled to preliminary injunctive relief, especially given the fact, and you've probably, you know our precedent that says some, I think it's an Ed Karn special, there is dicta and there is dicta and there is Supreme Court dicta. And the implication is we don't lightly walk away from Supreme Court dicta. And even if this is dicta, can we, consistent with our own precedent about precedent, walk away from it? Again, we're not asking the Court to walk away from this. Or not to be bound by it. I think the Supreme Court, or this Court, should take the Supreme Court order for what it was, which again is the denial of an emergency stay application. The Court made clear at the end that it expected the litigation in the lower courts to proceed with dispatch. It didn't seem to think it was resolving these questions, you know, for all purposes and for all time. Obviously, the Fifth and Sixth Circuits have heard arguments in similar cases, and those cases have been pending now for, you know, several weeks or a month or two. And it's not like either court has just said, you know, government, you lose, see the Supreme Court. So we think there is room for further litigation. And again, just to get back to 10610, which is, as I said, the provision of the rule that is stopping just straight up, you know, get out of my classroom because you are trans discrimination, there really is no valid textual basis for not incorporating Bostock's central teaching to Title IX. I'm not sure I disagree with you about that. I mean, you know, I was sort of pressing Mr. Norris on this. I actually think that the difference between because of sex and on the basis of sex is negligible. I'm not sure what the textual difference between those two things is. But he has the spending clause on his side. Right. So I think the spending clause, honestly, is largely a red herring for a few reasons. I would point the Court to the Supreme Court's decision in Jackson. This is, you know, as Your Honor knows, the question about— Again, just kick a man while he's down. I apologize. But what Jackson holds is that the Board should have been put on notice by the fact that our cases since canon, such as Gebser and Davis, have consistently interpreted the private cause of action broadly to encompass diverse forms of intentional sex discrimination. So what we take the Court to be saying there is that, you know, recipients should have been on notice of what the statutory language means as interpreted by various subsequent cases. So that's Jackson. And then Bostock itself, while not a spending clause case, does address a sort of elephant-in-mouseholes argument, which I take to largely be, like, the precursor to the major questions doctrine. And the Court says there, you know, maybe there's an elephant, but it's never been hiding in a mousehole. Like, the statute is sufficiently clear. And so we think what those cases are teaching us is that if we're right about the and what Congress said, then people should have been on notice of that. And as Your Honor suggested, there really isn't a valid basis for distinguishing between the language because of and on the basis of. This Court's cases make clear that Title IX incorporates the same but-for test that is used in the Title VII context. So does that mean we could still find in your favor without undermining the decision in Adams? Is that essentially what you're presenting to us? So we think that is certainly true. And it's the easiest to do that as to 10610. Like, we acknowledge that Adams introduces additional complexities on the 106.31a2 issue that I was discussing earlier. But certainly on the 106.10 issue, Adams is just not dealing with that at all. In fact, Adams says specifically, like, we acknowledge that Bostock said that discrimination on the basis of gender identity is a form of sex discrimination. But that's just not an issue in this appeal because Adams, again, was about the sorting question, whereas 106.10 is addressing just straight up, you know, sit in the back of the bus because you're transgender type discrimination. And to clarify for me, does that mean that the Department's criticism of Adams is a criticism that left open what you're claiming is still a question that Adams didn't address? I'm trying to understand, you know, we have Adams, we have Louisiana. It does seem that we're bound in some way. It just depends on how much flexibility we have and or want to exercise. But I'm also trying to understand, while not having precedential value, the import of the Department's criticism of Adams. Right. So Adams, as I was trying to articulate, and I'll try to be clearer, Adams is addressing the question of what bathroom a transgender individual can use. It arises prior to the issuance of this rule here. You know, we would submit that it rests upon certain unscrutinized and incorrect assumptions about the bathroom regulation that was then in effect and that has now been superseded by the 2024 regulation. But the point I want to emphasize is that Adams was not Adams was not a decision interpreting just a regulation. Right. I don't see how you can say that a regulation overrides the statutory and constitutional basis of Adams. Well, I think it was applying 106.33, certainly. But yes, it was doing so on the on the assumption, which, again, was really not scrutinized by the parties, that 106.33 was implementing 1686. And on the on the question of of the textual differences between the statutes, I I agree that there's a thin difference between because of and on the basis of. But why why isn't the difference in text the context of the other provisions of the statute? Right. Where Title VII is talking about discrimination, whereas, excuse me, of similarly situated people, whereas Title IX specifically recognizes the differences between men and women and is specifically dedicated to preserving some or accounting for some of those factual differences between men and women. Why isn't that context in the text of the two statutes? What makes the difference?  So Title IX absolutely has some statutory exemptions that permits, you know, different treatment of the sexes in certain contexts. Nothing in the rule is inconsistent with that. So 106.10 certainly does not conflict with that. Again, that's just the like you cannot straight up harm trans people for being trans provision. But even as to 106.3182, which is what I think of as sort of the sorting provision of the rule, that provision recognizes that it does not apply in contexts where Congress has actually permitted disparate treatment of men and women. The regulation had to take a pretty roundabout way to solve that problem, didn't it? I don't think so, Your Honor. I think it is reflecting sort of longstanding discrimination law. As the Supreme Court held recently in Muldrow, you know, discrimination needs to cause some harm. And so in the main, for example, the separation of men and women into different bathrooms does not cause cognizable sex-based harm. And so there's no problem there under the statute or the regulations. But 106.3182 recognizes that when that separation does cause cognizable sex-based harm, then it's a problem under the statute. And then it specifically defines cognizable sex-based harm in a new category, right? So the second sentence of 106.3182, yes, explains that individuals suffer cognizable sex-based harm when they're forced to use a sex-separate space inconsistent with their gender identity. And I think the point I would just underscore is that that is really an evidentiary finding based on the voluminous factual record that was submitted to the Department. And I don't take my friends on the other side to really disagree with the proposition that transgender individuals suffer harm when they are excluded from a space that aligns with their gender identity. I think their position is just that it doesn't matter under the statute. Okay. Can you speak to the scope of the injunction that they're requesting as well? I mentioned as an example the lactation room accommodations. And the response given by the other side is that they're transgender individuals who might nevertheless be able to benefit from that. Can you respond to that as well as their argument that the heart of the regulations is so influential maybe on the other provisions that none of it can stand at this point? Sure. Happy to do it. I think Your Honor is right that the sort of broad thrust of plaintiff's argument here and what Judge Sutton wrote for the Sixth Circuit is that, like, because 106.10 or the notion of sex discrimination is referenced throughout the rule, that means that if the court doesn't like, you know, 106.10, the rest of the rule has to fall. And I think that's really just built on a logical fallacy. And the easiest way to know that is that prior to this rule in the 2020 rule and for decades prior to the 2020 rule, there were Title IX regulations that referenced sex discrimination, but there was no provision like 106.10 that actually defined what sex discrimination was. And so if this Court were to vacate 106.10 or preliminarily enjoin enforcement of 106.10, there's no reason to think that the rule couldn't continue to function without that definition. Conversely, if this Court were to issue, you know, narrower relief and just say that 106.10 is basically right, but we're going to, like, strike the word gender identity or bar the Department from enforcing it as to gender identity, you know, then all of the provisions in the rule could simply be enforced on that understanding. But you haven't requested that, have you? What we've requested is as narrow an injunction as, you know, as humanly possible. I mean, right, but I believe that the first time I've heard the idea floated of simply striking gender identity is right now, and that's a pretty big rewrite that you'd be asking us to do. Well, I think it's challenging, Your Honor, for the Department to, you know, offer the Court sort of a way to issue a limited injunction without knowing what legal objections the Court has, you know, to the Department's rule. I think that's part of the problem, though, right? It's very difficult to tell how any of these pieces interact with one another. And you guys, I don't think, have been very specific about telling us, okay, here's what you can keep in place. Here's what is not affected by this new definition. And here's what is. I think that if you were wanting us to give a more narrow injunction, it would have been helpful to hear what that would look like. I think respectfully, Your Honor, that premise sort of flips the burden, right? And so if plaintiffs persuade the Court that certain provisions of the rule are unlawful, then the Court can issue relief as to those provisions and no others. So the Department doesn't need to provide a list of the provisions that are not injunctions. What I'm saying is the plaintiffs have suggested, I think persuasively, that these new provisions are so integrated into the entire rule that it would be very difficult to try to piece them out in any logical, understandable, enforceable way. And I've not heard from the United States that there is a way to do that. So, again, I don't think that's a task for the Court, right? So if the Court were to say 10610 is unlawful, you're enjoined from enforcing it or, you know, temporarily vacating it or whatever, then it would be the Department's job to enforce the remainder of the rule without that provision. The Court doesn't need to go through and, you know, say this provision lives, that provision doesn't.  But Judge Grant's point is, as part of the severability analysis, it is our job to figure out whether the three infect the entire rule or not. And Judge Grant's question is, she says the plaintiffs have made a good case that the three do infect the entire rule. And so now, absent argumentation or specification from the United States, we don't really sort of have a counterargument to that. We don't really accept to say, no, they don't. Well, I mean, that certainly is our argument. No, they don't. They don't infect any of the remaining provisions of the rule. None? Correct. You'll understand why that's not persuasive. So the remainder of the rule can be enforced either without a definition of sex discrimination or with a different definition of sex discrimination. Look at the grievance procedure provisions, for example, right? So this rule has, and plaintiffs actually challenged for a while in district court, you know, a number of reforms that increase recipients' flexibility when responding to allegations of sex discrimination. And it deals with things like evidentiary burdens and, you know, cross-examination procedures. And whether the scope of claims that can be brought includes gender identity discrimination or not is just sort of irrelevant to that question. Because a cisgender female who doesn't have access to lactation services could still benefit because of the biological sex as opposed to a transgender person who arguably might not benefit from that provision? I mean, it's hard for me to see how the definition of 10610 is infecting a rule that requires that nursing mothers be able to express breast milk in a place other than a toilet. That doesn't seem to be tied up with 10610. It's also really hard to see how plaintiffs are irreparably injured by that provision or what their legal objection is to it. And I think it's a great example. But that's, as your friend on the other side said, that's not the severability analysis that their clients are specifically harmed by each individual provision. The severability analysis is whether you can show that there's a likelihood that this is not all completely intertwined. And I've not heard anything different than what you presented to the Supreme Court, which was not enough. So can you tell me what you're telling us about severability that you did not tell the Supreme Court? Well, I hope I'm making arguments that are broadly consistent with what we told the Supreme Court. But just to underscore the points, you know, as a matter of this court's equitable discretion in crafting any injunctive relief, it should be no more burdensome than necessary to provide complete relief to the plaintiffs. And it's just not clear why plaintiffs need relief as to provisions that they're not even alleging in this court are unlawful. Can I ask you one about compliance costs for irreparable injury? Well, I guess two. One, do you dispute Mr. Norris's, you know, kind of back of the napkin calculation about the sort of $100 million, the big upfront kind of balloon payment? That's the factual question. So are the compliance costs ruinous or negligible or somewhere in between? Hard to say, Your Honor. There are certainly some compliance costs, as there are with respect to any Federal regulation. What I think the district court said is that plaintiffs had not really explained exactly what those costs were, how they tied to the challenged provisions, how they related to their overall budgets. And so the district court found that plaintiffs had just not put enough meat on the bones of those costs. And I think your colloquy with counsel earlier gets at an important point, which is that I don't think this Court should want every APA case to proceed on a preliminary injunction track. That's not how APA litigation generally works. And so if this Court were to bless the idea that, you know, even a cent of compliance costs is enough, then we're just never going to have, you know, sort of normal APA litigation again. I think the Court should be concerned about that.  Second question. Mr. Norris said, and I think not without some justification, that perhaps we've already crossed that line in the Georgia v. President case, where we did say compliance costs, unrecoverable compliance costs are irreparable injury. And as I recall, we rejected the reasoning of an unpublished decision which had suggested the contrary.  So obviously, it was a different evidentiary record in that case. It was, you know, different district court finding. I think this case is not that case. But if this case is an opportunity to sort of clean up any ambiguity and make clear that, you know, it needs to be more than just like a cent of compliance costs, and plaintiffs do really have an evidentiary burden on that question, we would urge the Court to take that opportunity. I'd suggest that you would need an en banc decision to clean up that purported lack of  Well, if that's how the Court sees it, I guess. Said the author of the opinion. We just have one more question on the scope, because clearly I have a problem. That's the challenge I have. So in determining the scope of the injunction, in the context of severability, we still have to go through the preliminary injunction factors, which the fourth step is the public interest, right? And in the public interest, even though we're talking about this case in the form of gender analysis, also speaks to those who are cisgender, correct? Of course. So then in deciding whether or not these other provisions should stand, it's also an analysis of whether or not cisgender individuals would somehow benefit from the stay. Or is that way of thinking about it incorrect? No, I think that's absolutely right. I mean, from reading the briefs in this case, you might think that this case is or that this rule is like the transgender rights rule. But this is a broad Title IX rule that does any number of important things. We talked about lactation spaces and grievance procedures and retaliation. This rule does tons of things. And absolutely, yes, in considering the public interest, I think it's highly relevant that an injunction against the entire rule affects numerous protections that apply to everybody and not just transgender individuals. Are you making any argument that the plaintiffs below forfeited any of their arguments? So I think, as counsel alluded to earlier, with respect to 106.31a2, I think they have presented a sort of very thin argument in district court. And it's not clear to us that that was squarely, you know, that all of the arguments they're presenting here are squarely preserved. And certainly, are you arguing forfeiture, yes or no? Maybe with respect to certain arguments. But we're not arguing, you know. Can you please tell me anything that you're arguing forfeiture on specifically? So I think as to 106.31a2, we've suggested that they're making a statutory argument and not an arbitrary and capricious argument. And then again, on the PI factors on irreparable harm, I don't know if this is a forfeiture point or just like a sufficiency of the evidence points. But when the district court said they hadn't presented enough evidence on irreparable harm, you know, we think that deserves due respect from this court. That's, I mean, I think that always there will be an argument from the other side about whether enough evidence was shown, right? But that's different than a forfeiture argument. That's fair. And yeah, I don't have anything else to offer on forfeiture. Thank you. Thank you very much, Mr. Myers. Thank you very much, Your Honors. We would ask the Court to affirm the denial of the preliminary injunction here. Very well. Thank you. Mr. Norris, you've got three minutes. Thank you. So to wrap up my questioning about the scope, how does denying cisgender females access to a lactation room advance the public interest? Your Honor, I'm sure there are good arguments to be made for that type of rule if it was passed by its own. No one asked them to package lactation spaces for cisgender females in a rule. But he's saying you can unpack it, that you all have framed this challenge as, well, only a rule pertaining essentially to transgender individuals. But the whole part is that whether or not gender identity is included. If it's not included, then it still does benefit, some would argue, cisgender individuals. So again, how does striking down all of these provisions, especially those that can clearly apply only to cisgender individuals, advance the public interest? Well, Your Honor, I think it's just the separability point that we've been talking about. Ohio v. EPA from the Supreme Court says there has to be some reasoning in the rule. How does, I mean, I don't know what to do but to repeat my question. I just want to understand how do cisgender females who need access to a lactation room nevertheless benefit from striking this provision down? Your Honor, the public interest is vindicated by enforcing the APA. This rule, the Supreme Court, all nine justices said that three central provisions of this rule violate the APA. Five justices said the rest of the rule, at least on a preliminary basis, should be frozen based on that conclusion. And I think my first point is going to be a related one, which is there is no striking anything. That's what they call the writ of erasure fallacy. This is a preliminary injunction. You can't cross out the definition of sex discrimination and pretend that every other provision doesn't reference that. But you can have an injunction that essentially denies access to a whole category of individuals who are not of your concern. I don't think it denies schools from doing anything. It's a question of whether the Federal Government can mandate that with the threat of enforcing, with the threat of cutting off your Federal funding if you don't comply with exactly how they want to do it, which is a little bit different. But that provision in particular references and incorporates, as Chief Judge Sutton said, the invalid definition of sex discrimination. And it will continue to do so even if there's a preliminary injunction barring enforcement of 106.10. You can't change the meaning. You can't scrub out provisions. Courts don't have that power. That requires a rewrite. And if there's a rule to be done on pregnant mothers who need nursing spaces, I hope they do that rule separately. But they did not, no one required them to package that with an extremely controversial rule that requires schools to put males into female restrooms, locker rooms, showers, overnight rooming arrangements. Do we have any way of knowing whether the administration would have included, say, the lactation provisions without the other parts of the rule that were implemented into them? We don't. My friend makes one argument, which is the bare fact that the rule has severability clauses in it. But Ohio v. EPA says that's not enough. The APA requires reasoned decision making. And so if the rule, if the other parts of the rule that are not illegal are not justified by themselves, is there not some consideration in the rule itself that those could stand alone, even if all of the rule's core provisions were struck down as unlawful, then the rule has to go too. And just one last thing. Chief Judge Stutton said the cost-benefit analysis of the rule as a whole assumes 106.10 is valid. So there are costs to federally mandated lactation spaces. Those were considered to be justified by the expansion of sex discrimination to transgender individuals and on the basis of sexual orientation. So you're saying that we can't just decide what rule we would have written if we had been in the administration, assuming that these three provisions are out. We can't decide, well, here's what we would have left in and here's what we would have taken out. Correct. The Supreme Court majority said that if these provisions are intertwined with the illegal provisions, they have to go too. And basic principles of administrative law, like in Ohio, say that if the rules were not justified independently in the rule with reasoned decision making, they have to fall as well. Can I ask you one question? What's wrong with Mr. Meyer's argument that, look, for years, these rules and regulations proceeded apace without some special definitional gloss. They could live again without the definitional gloss. What's wrong with that? I think it's the writ of erasure fallacy that a preliminary injunction can't eliminate that provision and then pretend that all the provisions that incorporate that language mean something else. I also think Chief Judge Sutton has a good point, which is, my friend can't tell you what that fill-in definition is. It is heavily contested in litigation. I don't think he would accept Adams as the definition that fills in. I'm not sure what it would be. And there's not going to be any definitive answer on a preliminary injunction that just says what is likely the case. We're not going to have an answer as to what fills in. So you're going to require schools to immediately, in the middle of the school year, adopt a hobbled version of the rule that not even the Justice Department can explain what it means. I think the better course and the course that almost every other court has taken is to just pause the status quo so that we can have these debates, which are really more like Bakatter debates and how much of the rule is going to be — I mean, you can't erase — the courts do erase provisions with Bakatter. I think that debate can be had at final judgment, after summary judgment.  And then just one housekeeping question, point of curiosity more than anything else, and maybe I've just missed this in the paper somewhere. How is it that South Carolina came to be one of your clients in this court? Well, South Carolina, you know, we have very liberal venue and joinder rules in the federal courts. So venue is proper in the Northern District of Alabama because Alabama lives there. Alabama's largest university is there. Seven of its ten biggest school districts are there. So venue only has to be good as for one plaintiff. Then the joinder rules say you can join any other plaintiffs who are basically challenging the same thing on the same grounds. So that's how that happens. We cite a case in our briefs. It's called — it's in this circuit, and it's called West Virginia v. Treasury Department. That's the same type of case. It was a case where 10 out-of-circuit States sued in the Northern District of Alabama. Would any relief that we or the district court in the Northern District of Alabama issued assist South Carolina? Yes, Your Honor. So it would be binding, we think, as with respect to the Education Department and South Carolina. They've litigated that in this case here. And you might say, well, we think the Fourth Circuit might say that this rule is actually lawful. We don't know that. There's no Fourth Circuit case that's been decided or that's even pending. But even if you thought that, there's really — this court's judgment would control. There's no way for a private, non-Education Department plaintiff to sue a school or the state of South Carolina for not complying with regulations. There is a private right of action under the statute. Do not believe that you're allowed to sue schools for violating the regulations. And multi-state coalitions often sue across circuit lines, right? They do. When the Trump administration passed its rule, there was a 17-state suit brought in the D.C. circuit, which, of course, no one belonged to except for D.C. OK, very well. Thank you both. We put you both through the ringer. We appreciate it. It's a very difficult case. That case is submitted.